## ROCK ISLAND IMPROVEMENT CO. v. PRINCE et al.

No. 22090. Opinion Filed Dec. 22, 1931.

Rehearing Denied Jan. 12, 1932.

George M. Porter (W. R. Bleakmore, W. H. Fuller, and J. L. Fuller, of counsel), for petitioner.

Claude Briggs, for respondents.

KORNEGAY, J. This is a proceeding in error to review the action of the Industrial Commission in making an order or award in favor of the respondent, and against the petitioner, which order is as follows:

"Now on this 13th day of January, 1931 the State Industrial Commission being regularly in session, this cause comes on for consideration pursuant to a hearing had at McAlester, Okla., March 19, 1930, and a hearing at Wilburton, Okla., November 5, 1929, to determine liability and extent of disability, at which hearing claimant appeared in person and by his attorney, Claude Briggs, respondent being represented by George M. Porter, and the trial commissioner having heard a portion of the testimony, observed the demeanor of the witnesses on the stand, considered and weighed all the evidence presented in the hearings before her, and other hearings in this cause, and being otherwise well and sufficiently advised in the premises, finds the following facts:

"I. That claimant, William Prince, sustained an accidental injury arising out of and in the course of his employment with respondent herein on April 3, 1928; that claimant has been temporarily totally disabled or temporarily partially disabled without any wage-earning capacity being established to March 19, 1930, from the date of said accident.

"2. That the average wage of claimant was $5.51 per day.

"The trial commission is of the opinion: By reason of the aforesaid facts, that claimant is entitled under the law to compensation at the rate of $18 per week from April 5, 1928, to March 19, 1930, less any compensation heretofore paid.

"The trial commission is of the further opinion: That this cause should be continued for further hearing to determine the extent of disability, if any, beyond March 19, 1930.

"It is therefore ordered: That within ten days from this date the respondent, Rock Island Improvement Company, pay to claimant compensation at the rate of $18 per week computed from April 5, 1928, to March 19, 1930, less any compensation heretofore paid.

"It is further ordered: That within 30 days from this date the respondent file with the Commission proper receipt or other report evidencing compliance with the terms of this order."

The order is signed by all of the commissioners.

During the progress of the testimony, the position of the respondent before the Commission is stated as follows:

"By George M. Porter: Our contention all the way through is that this man is a malingerer. He went out and worked on the road and when we caught him doing that work and still drawing compensation, we stopped compensation. By the Court: Did you ever tender him any other work? By George M. Porter: The testimony shows he did not even come back after his compensation check."

An elaborate brief has been filed on behalf of the petitioner by George M. Porter, attorney for petitioner, W. R. Bleakmore, Oklahoma City, general counsel for petitioner, W. H. Fuller and J. L. Fuller, McAlester, Okla., of counsel for petitioner. In the brief, attack is made upon the order of the Commission, which is set out in the brief, and an abridgment of the evidence is also set out therein. The attack is made in three propositions. The first proposition is as follows:

"The Commission's findings, that respondent (claimant) was temporarily (temporily) totally disabled, or temporarily (temporily) disabled without wage-earning capacity being established to March 19, 1930, is erroneous and wholly unestablished by any evidence."

The second proposition is as follows:

"The Commission erred in not taking in-

to consideration the wages earned by the respondent while working for Latimer county and others under the road overseer of said county."

The third proposition is as follows:

"That the order and award was erroneously made in that the Commission did not hear and consider all the testimony adduced in the respective hearings."

Numerous authorities are cited to sustain the positions taken, mostly from this court. From the statement of the findings, it appears that they were on questions of fact, and that under the well-known rule as established by the Industrial Act itself, we are not permitted to review the findings of fact of the Industrial Commission. However, there has been engrafted on the statute the rule that we will not be permitted to review such findings where there is any evidence reasonably supporting the findings of the Commission.

Under these conditions, the entire record has been examined. It appears to be conceded that the claimant below was in the employ of the petitioner. The man was engaged in coal mining. A rock fell on him on April 3, 1928. It was discovered by an X-ray on April 16th that he had sustained fractures to the 8th and 9th ribs, and at that time he was strapped, as a result of the X-ray examinations, as shown by the attending physician's report. Prior to that time the company had sent Dr. Miller to examine him, but the man thought he could get well at that time without professional help, and declined his services. He did not get well, however, as he thought, by the use of simple liniments, and was later taken to the hospital, X-rayed, and on May 5, 1928, the Commission received the employer's first notice of injury, in which it was stated that the man was a machine runner, and had been in the employment of the company for 25 years, and was earning $5.51 per day, and in describing the accident it says:

"This man states he was putting machine back and a large rock fell on him."

In describing the injury it says:

"Numerous small lacerations and scratches over back and shoulders, and strained back, 5 to 10 days."

The employer was the Rock Island Improvement Company. The agent of the employer, sending in the notice of accident, was William Jones, general superintendent.

On the 26th of May, 1928, the Commission received the report of initial payment, in which it is stated that the company was working on its own risk as an insurance carrier. First payment was $96. On the 17th of December, 1928, employee's first notice of injury was received by the Commission, in which the cause of accident was stated, "by rock falling." Nature and extent of injury was, "hurt in back."

On August 26, 1929, the claimant asked for medical attention, and asked for an examination by some physician not in the employ or designated by respondent to make a thorough examination of the claimant's injuries. On the 3rd of September, 1929, Dr. J. F. Park was designated and claimant was ordered to report to him. Following that, testimony was taken of the claimant, and the examining physician, and two other physicians.

The report of the examining physician comprises three pages of single-spaced typewritten matter, beginning with page 61 of the record. If that report is correct, little doubt could be entertained of the permanency of the injury that the claimant received, and of his inability to labor as a result of the accident. It appears therefrom that the night of the accident the claimant was seen by Dr. Miller, who wanted to care for his injury on account of petitioner, but was requested by the patient not to do so. On the 14th of April, using crutches, he went to the office of Dr. Carlock. From there he was taken to the hospital, and X-rayed, and his back strapped from the lower thoracic region down to and including the sacrum. For three weeks he remained strapped. At that time it was decided that the right 12th rib was fractured or its verterbral end dislocated. Two weeks later he was again X-rayed, straps removed, and given some liniment. Examination by Dr. Kilpatrick showed constant pain in the lumbo-sacral region, and continued pain after he was able to get about on crutches and was greatly increased by flexion of the body, walking considerable distance, standing or sitting on hard surface. With the passage of time, the pain changed from being constant to recurrence at intervals, some days relatively free, others severe. Pain in back decreased in severity, but pain about the right knee increased, followed by joint crepitation and restricted movement. Used crutches from April 16th until about the middle of June. Had lost about 20 pounds in weight since the accident. Only work performed was when he drove an ash wagon on road work, simply driving, loading and unloading being done by others.

The past medical history was recited. Appendicitis had developed, followed by an operation. Several years ago, while working for the Rock Island Company, he sprained his back, and was off work eight days, but had no further trouble with it. Has had some abscessed teeth extracted.

Physical examination of the man showed that he was 66½ inches high, weighed 107½ pounds, temperature, 98, pulse 82 at rest, and 110 after moderate exercise. Eyes regular, apparently from the examination. No facial paralysis. Various other things appear to be normal, and the following:

"Thorax a-symmetrical with protrusion and thickening of right second rib in mid-clavicular line, and bulging of precordial region on the left. Expansion is greater on the left side of thorax, especially above the clavicle; at which point there is an increase in hyperresonance, but no increase or decrease in tactile or vocal fremitus. There are rales at the end of exhalation, transitory in character, in the supraclavicular regions, most marked on the left. Respiratory excursions normal; no friction or other adventitious sounds. Physical examination elicits no departure from normal at the 12th right rib. There is a symmetrical kyphosis (postural) extending from the 3rd to the 10th thoracic vertebra."

There is a report on the heart and about his appendix scar. Gait normal. When he sits and spine is hyperflexed, pain is much less. Right knee joint crepitation when arising from squatting position, assists himself with hands from a sitting position, complains of pain in lumbo-sacral region on flexing thigh upon abdomen with leg extended.

The examination appears to have been extensive. The conclusions were that the X-ray rules out the possibility of injury to the bony structures, and the clinical examination elicits no proof of pathologic change. Present condition due to decreased muscle tonicity, resulting from his accident, with enforced non-use of the involved parts, and the probability that the absorption from his infected teeth is accentuating the condition. The latter part of it is as follows:

"It is out of the question to expect him to stand up under any sustained strain upon the lumbo-sacral region when he first returns to work, but sufficient time should be allowed him to go through the 'hardening' period."

His own testimony as to his ability to work, and of others, and the details, as given by the superintendent when he "caught" him at work, and his action thereon, shows that he was using his team and working on the road and getting $5 a day for the use of himself and the team.

We have examined the authorities cited on the first proposition. We do not think that they would justify a holding here that the Commission was out of line in its decision on questions of fact in this case. The evidence in this case does not indicate to our minds that the claimant, who had been in the service of the company for 25 years, was at the end of that time a malingerer.

The second proposition is that the Commission erred in not taking into consideration the wages earned while working for Latimer county, and others under the road overseer of said county, and the case of Harbor-Longmire-Pace Co. v. State Industrial Commission, 147 Okla. 207, 296 P. 456, is cited. As an earning proposition in this case for himself, aside from the use of his team, the evidence would indicate that it was negative. However, as the Commission still has jurisdiction of it, under the law, if it should develop that he had earned anything worth while, so that industrially he was restored, it can be taken into the account later.

The third proposition is that the order and award was erroneously made in that the Commission did not hear and consider all the testimony adduced on the respective hearings. The evidence of that is merely conjectural. The recital in the order is that the trial Commission heard a portion of the testimony, and "observed the demeanor of the witnesses on the stand, considered and weighed all the evidence presented on hearing before her, and other hearings of the cause." It is signed by F. L. Roblin, trial commissioner, and is signed by all three members. As to whether or not the other two members had all the testimony read, the record is silent. The presumption, however, is that if the body were together, all of them were advised, either by reading or having read, or by the report of their associate of the evidence. The findings of the doctor undoubtedly were before them. That alone in this case would not only justify their finding as to the disability, but when closely analyzed would stand as an insuperable bar to any finding other than what was made. The man, after 25 years of service, was evidently a physical wreck, as a result of the rock falling on him, that was so heavy that he could not get out from under it himself until it was removed.

The statement is made in several parts

of the brief, and especially the latter part of it, that the disability after October 3, 1928, was not the result of the injury, but was due to willfulness, and on page 43 that the Workmen's Compensation Acts were not intended to be a pension, and complaint is made that the respondent Prince had not availed himself of sufficient medical service after May 26, 1928, and on account of his own willful failure to do light work he allowed muscle flabbiness to develop. The Commission found to the contrary to this contention as far as it went, and we are not authorized to disturb this finding, and on this record are not inclined to do so.

The last charge of willfulness apparently is found just before the conclusion, and is as follows:

"It seems to us that this is a clean cut case of election, upon the part of the respondent, to remain in idleness, with the expectation to continue indefinitely his lack of exercise muscles, at the expense of the Rock Island Improvement Company."

This evidence does not justify the inference that is there drawn.

It may be that later developments will show that this ill-proportioned thorax of the claimant will rectify itself, and that the kyphosis may become eradicated or found to be natural and having no connection with the accident, and that the back muscles of the claimant may be restored to the usual tonicity. But if that is done, it will be a matter for the Industrial Commission, upon the evidence before it, to decide on.

We find nothing in the record that would justify our setting aside of the award of the Industrial Commission in this case, and it is accordingly affirmed.

LESTER, C. J., CLARK, V. C. J., and CULLISON and McNEILL, JJ., concur. RILEY, SWINDALL, and ANDREWS, JJ., dissent. HEFNER, J., absent.

---

ANDREWS, J. (dissenting). I cannot agree with the view of my associates as to the facts shown by the record in this case.

The award of the State Industrial Commission is based on a finding as follows, to wit:

"That claimant, William Prince, sustained an accidental injury arising out of and in the course of his employment with respondent herein on April 3, 1928; that claimant has been temporarily totally disabled or temporarily partially disabled without any wage-earning capacity being established to March 19, 1930, from the date of said accident."

If that finding is correct or if there is any competent evidence reasonably tending to support the same, it is binding upon this court and the award of the State Industrial Commission should be affirmed. Therefore, a question in the case is the correctness of that finding. The record speaks for itself. It shows that the claimant appeared in his own person and by his attorney at a hearing to determine liability and extent of disability and that at that hearing he testified that he was 43 years of age, in the employ of the petitioner herein, running a coal machine in a mine and receiving $5.51 per day when, on the 3rd day of April, 1928, he received an injury to his back and knee which was caused by a rock falling on him in the mine. With reference to a time during the period in which the State Industrial Commission found him to be either totally disabled or without wage-earning capacity, he worked on the highway driving a team. He testified:

"Q. How long did you attempt to do that work? A. I don't remember how many days, but I worked several days—I worked three or four days a week for several weeks. Q. Did that require the exertion of special straining or just walking around? A. No, it didn't require that—most all the work was hauling—it was a dump wagon. Q. The only work you did was to sit in the seat and drive? A. That is all driving and standing up."

The petitioner paid the claimant compensation until the early part of October, when the superintendent of the petitioner saw him at work on the public highway. With reference thereto the claimant testified:

"Q. You had been in regularly and getting compensation checks up to that time? A. Yes, sir. Q. And the early part of October —who is the superintendent of the Rock Island? Raymond Dickson passed you on the road? A. I was standing there and they walked up there. Q. You saw them and you never came back to the office to get your compensation check was there for you from October 1st to October 15th? A. I did, yes —I went to the girl there. Q. You say you came to the office to get that? A. No, sir. I never went to Mr. Jones. Q. And you never asked Mr. Jones why he wasn't paying you? A. I made three trips over there to get my compensation. Q. You know Mr. Jones had full authority? A. I knew that. Q. You never went to Mr. Jones and asked for the check? A. He told me to go and ask that lady, and she refused to give it to me and held it up. Q. When you were examined by Dr. Parks at McAlester you told Parks that you only worked three days on an ash wagon driving it since your injury? A. Dr. Parks got it wrong— I didn't tell him that. Q. Did you say you did or did not? A. I said I did work—Q. Three days? A. No, I didn't tell him three

days—I told him I didn't remember just how many days. Q. The doctor was pretty particular about asking questions? A. Yes—. Q. And you deny telling him you worked three days? A. I don't remember. Q. Do you mean to tell this court that all you did was sit on the wagon and hold the reins as you say? A. No. Q. The wagon you spoke of has 2 x 6 sideboards does it not? A. 2 x 4. Q. And when your wagon is loaded with shale, when you drive up to where you unload it, you pull the sideboards up? A. Not the side. Q. You pull the end boards? Then you take hold of the 2 x 4 and you give a twist and lift, and when you do that you practically had to lift the entire side? And then on the next one you give it a twist and let it down—you did that, didn't you? A. No, sir; they had hands out there on the road that done that. Q. You did the balance, didn't you, after they made the first lift? A. There wasn't anything else there. Q. You had to lift it in order to drop it? A. But I stayed on the wagon. Q. You got out some rock too, didn't you? A. Yes, sir. Q. You and George Rowe? A. Yes, sir. Q. The fact of the matter is, Mr. Prince, you did the work of an ordinary working man—the work any abled-bodied man would attempt to do? A. No, sir; I couldn't do some of it. Q. You were doing the full work of a teamster? A. Yes, sir. Q. You never told Mr. Burdett or George Rowe you were not able to do a man's work? A. I didn't tell him. That is the reason we went together to get the rock for them to use in those culverts—it was their rock. He loaded lots of the big rocks in my wagon and in his own wagon—we helped each other. Q. You worked on October 3rd, didn't you? A. I don't know the date. Q. You worked on October 4th? A. I don't know. Q. You worked on October 9th, didn't you? A. I don't remember. Q. You worked October 10th? A. I told you I didn't know the dates. Q. You worked on the 12th, 16th, 17th, 23rd, 24th, and 25th of October, didn't you? A. I haven't the dates. Q. Then you worked on the 1st and 2nd and 5th, 7th, and 20th of November? A. I haven't the dates. Q. Then you worked on December 10th, 11th, is that right? A. I haven't the dates: I cannot say. Q. Isn't it a fact all of that work is done for the company where you draw your pay for Latimer county? A. Yes, that is right. Q. Who were you working for? A. I believe I worked one half day with my team for one fellow and I believe two others. Q. In other words, you worked the time for three men? A. I believe so. Q. You received $5 per day? A. I did while I was hauling cinders. Q. Fact of the matter is you did all the work and worked as much as Mr. Burdett could give you? A. No. Q. Well, he told you he would give you work? A. He asked me about me putting my team on the road and he said, 'Can you drive your team?' He said, 'I got to have teams, and if you can drive your

team, I have work.' Q. When you were doing this work on October 12th—October 9th, 10th, and 12th, you knew you were drawing compensation for these days? A. Yes. Q. And you went in and attempted to draw compensation for the period you thought that was right? By Mr. Briggs: Objected to as being incompetent, irrelevant and immaterial. By Mr. Porter: All right; I withdraw that last. By the Court: Overruled."

An associate of the claimant testified:

"Q. Were you working on the public highway at the same time he was working? A. Yes, sir. Q. State what work Mr. Prince did and what work you were doing. A. Well, I was shoveling and hauling, doing everything there to be done. Q. Did Mr. Prince do the same thing? A. Yes, sir. Q. Did you load rock? A. Yes, sir. Q. How many days were you loading rock? A. 26. Q. Did he help load the rock on a wagon? A. Yes, sir. Q. What did the rock weigh? A. Well, some small and some heavy—some were pretty heavy. Q. I will ask you if he ever loaded heavy rock on the wagon? A. We helped each other. Q. How much did they weigh? A. Well, I complained to him about some of them being heavy and he did too. Q. No one worked with you at that time? A. Well, I was pretty weakly myself; I had to do the work that I could. Q. Did Bill help out your end of it? A. Well, I guess we did. Q. Did you also drive a shale wagon? By Mr. Briggs: We object to that—By Mr. Porter: Strike that. Q. What kind of work is that driving a shale wagon? A. Well, driving a shale wagon is just a wagon—like an ordinary wagon I guess."

A road overseer testified with reference to the work of the claimant, as follows:

"Q. Do you know the claimant William Prince? A. Yes, sir. Q. Did he work in your road gang along in October, November, and December, 1928? A. Yes, sir. Q. What kind of work did he do—county work and did he receive county pay? A. Yes, sir; he was drawing county pay. Q. Did you keep a record of the days he worked? A. Yes, sir. Q. Do you have those books? A. Yes, sir. Q. State what dates he worked during the fall of 1928 out there. A. October 3rd, and 4th, one half day. October 9th, 10th, 12th, 16th, 17th, 23rd, 24th, and 25th—that was in October. In November—1st, 2nd, 5th, 7th, 20th, and 21st. December 10th, 11th—I believe that is all he worked. Q. What class of work was he doing? A. We were hauling cinders. Q. What kind of work and hauling was he supposed to do? A. He was driving a team. Q. Is the hauler required to help dump his wagon? A. I had men out there to dump—he drove the team. Q. Do you remember him getting out some rock for the culverts? A. Yes, I don't re-

member the date it was—he was working for some other man. Q. He did that work? A. Yes, sir—he hauled some rock, he and George Rowe."

—and :

"Q. During this period of time he was working for you on the road, did he do a good man's work as required in his position? A. Yes, he kept his turn. Q. How long a haul was he making? A. Well, some was close to haul and some a mile and a half. Q. It was riding in an ordinary lumber wagon? A. It had a lumber bed on it. Q. What position did he ordinarily use in driving? A. He could sit or stand, either one. Q. If he sat down, he would have to sit on the shale, and if he stood up, he would have to stand on the shale? A. Yes, sir. Q. You didn't observe he was having any difficulty or trouble in doing his work? A. No, sir."

In view of the record, I am of the opinion that the award is erroneous. It shows that while the claimant was drawing compensation from his employer he was working on the public highway and drawing wages for that work, which is admitted was $2.50 per day for himself and $2.50 for his team. He did that until his employer caught him and stopped his compensation. Under the provisions of section 7290, C. O. S. 1921, as amended by section 6, chapter 61, Session Laws 1923, his injury entitled him to 66⅔ per centum of the difference between his average weekly earnings and his wage-earning capacity thereafter in the same employment or otherwise payable during the continuance of such partial disability, not to exceed 300 weeks. The award of the State Industrial Commission was not based on that provision of the statute and is not applicable thereto. The claimant was not temporarily totally disabled and he was not temporarily partially disabled without any wage-earning capacity. His disability was partial and he had a wage-earning capacity. The section of the statute denominated "other cases" is the applicable section. It was not applied by the State Industrial Commission.

In my opinion, this award should be vacated and the cause should be remanded to the State Industrial Commission, with directions to ascertain the difference between the average weekly earnings of the claimant and his wage-earning capacity after the injury in the employment and to make an award of compensation in the amount of 66⅔ per centum of the difference, not to exceed 300 weeks.

Mr. Justice RILEY and Mr. Justice SWINDALL concur herein.